UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN RAVERT, | ) | CIVIL ACTION NO. 4:20-CV-889 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| MONROE COUNTY, *et al.,* | ) | |
| Defendants | ) | |

MEMORANDUM OPINION
*PrimeCare Defendants' Amended Motion to Dismiss (Doc. 11)*

I.   INTRODUCTION

Shawn Ravert ("Plaintiff") was, at one time, an inmate detained in the Monroe County Correctional Facility ("MCCF"). He alleges that three members of the medical staff at this facility failed to make a timely diagnosis of his malignant melanoma. Plaintiff has sued the County, the private corporation contracted by the County to provide medical care at the county facility, and three members of the medical staff (employed by the private corporation).

The private corporation and members of the medical staff (collectively the "PrimeCare Defendants"), have filed a Motion to Dismiss (Doc. 11). For the reasons explained herein, that Motion to Dismiss (Doc. 11) is DENIED.

II.   BACKGROUND & PROCEDURAL HISTORY

Beginning in October 2016, Plaintiff was incarcerated at MCCF. (Doc. 1, ¶19).

On December 14, 2016, a lesion or "skin tag" on Plaintiff's right shin started bleeding while Plaintiff was playing basketball. (Doc. 1 ¶ 20). Plaintiff sought medical care at MCCF's medical department. *Id.* Medical staff provided wound care and discharged Plaintiff without further examination. *Id.*

On December 26, 2016, Plaintiff attempted to remove the lesion by himself, using a piece of string. (Doc. 1 ¶ 21). Following this attempt, Plaintiff sought medical care at MCCF's medical department. *Id.*

On December 27, 2016, Defendant Kenneth Wloczewski examined the lesion on Plaintiff's leg. (Doc. 1, ¶ 22). During that examination, Defendant Wloczewski noted that the lesion had been present for one year and that removal was scheduled for the following week. *Id.*

On December 28, 2016, Plaintiff was examined at the MCCF Medical Department for follow-up. (Doc. 1 ¶ 23). During the examination, the lesion was "still intact" but appeared to be detaching from Plaintiff's leg due to Plaintiff's attempt to remove it. *Id.* The unidentified nurse provided wound care. *Id.*

On December 29, 2016, Plaintiff was examined by another unidentified nurse at the MCCF Medical Department. (Doc. 1, ¶ 24). During the examination, the lesion was "still intact" but appeared to be detaching from Plaintiff's leg due to Plaintiff's attempt to remove it. *Id.* The nurse provided wound care. *Id.*

Later the same evening, however, the lesion fell off. (Doc. 1 ¶ 25). When it did, Plaintiff was examined by Defendant Grace Ramos, a nurse at the MCCF Medical Department. *Id.* Defendant Ramos provided wound care to stop the bleeding. *Id.* She also conferred with an unidentified "on-call provider" by telephone to ask about preservation of the lesion that "fell off." *Id.* There was no preservative in the office. *Id.* Defendant Ramos was instructed to discard the lesion. *Id.*

On January 3, 2017, Defendant Wloczewski examined Plaintiff. (Doc. 1, ¶ 26). Defendant Wloczewski noted that the "skin tag" had fallen off and was gone. (Doc. 1, ¶ 26).

Eleven months later, on December 12, 2017, Plaintiff's right leg began to bleed in the same area while playing basketball. (Doc. 1, ¶ 27). He was examined by unidentified staff members at the MCCF Medical Department. *Id.* During the examination, medical staff observed the presence of a polypoid lesion, provided wound care, and discharged Plaintiff without further examination, restriction, or referral to the on-call provider or another specialist. (Doc. 1, ¶ 27).

Six months later, on June 7, 2018, Plaintiff was examined by Defendant Paulina Foley (a physician's assistant at MCCF) with complaints of redness and irritation of the skin on his right leg. (Doc. 1, ¶ 28). Defendant Foley noted a rash in the shape of a bullseye with a quarter-sized fleshly nodule in the center, and performed a punch biopsy to remove a portion of the nodule for analysis. *Id.*

On June 15, 2018, eighteen months after the skin tag was brought to the attention of the MCCF staff and seventeen months after the skin tag fell off, Plaintiff was diagnosed with invasive malignant melanoma. (Doc. 1, ¶ 29).

On June 18, 2018, Dr. Akan Westheim, confirmed the diagnosis of malignant melanoma. (Doc. 1, ¶ 30).

On September 6, 2018, Oncologist Mathew Miceli examined Plaintiff. (Doc. 1, ¶ 31). Dr. Miceli referred Plaintiff to surgical oncology for a wide resection of the melanoma, with a sentinel lymph node biopsy. *Id*.

On September 14, 2018, Dermatologist Quy Pham examined Plaintiff. (Doc. 1, ¶ 32). Dr. Pham noted that the melanoma had grown and occasionally bled. Id. Plaintiff was referred to skin oncology for treatment and staging. *Id.*

On September 27, 2018, Oncologist Colette R. Pameijer took a second biopsy of the lesion. (Doc. 1 ¶ 33). Dr. Pameijer recommended Plaintiff undergo a wide local excision and sentinel node biopsy. *Id.* Dr. Pameijer anticipated that Plaintiff would need to undergo a skin graft a few weeks after the excision and estimated that there was a 30% chance the cancer had spread to Plaintiff's sentinel lymph node. *Id*.

On October 15, 2018, Plaintiff had a third biopsy at Hershey Medical Center. (Doc. 1 ¶ 34). The biopsy showed T3b melanoma. *Id*. On November 21, 2018, a positron emission tomography ("PET") scan showed intense fluorodeoxyglucose ("FDG") activity (indicative of possible cancer) in Plaintiff's right leg lesion,

moderately intense FDG activity in retropharyngeal lymph nodes, and low FDG avidity in his spleen. *Id*.

On December 5, 2018, hematologist/oncologist Dr. Vineela Kasireddy examined Plaintiff and referred to surgical oncologist Jeffrey Farma for wide excision of the right leg melanoma. (Doc. 1, ¶ 35).

On January 25, 2019, six months after his first cancer diagnosis, Plaintiff had the following surgical procedures: a radical resection of a right pretibial melanoma; intraoperative lymphatic mapping; a sentinel lymph node biopsy of the right groin; and a skin graft. (Doc. 1, ¶ 36). Dr. Farma did the resection, mapping, and biopsy. *Id.* Dr. Neal Topham did the skin graft. *Id*. The surgical pathology report from this procedure described the excised mass as a 13 mm tumor with a pT4b Stage Classification. (Doc. 1, ¶ 37).

On February 25, 2019, Plaintiff was diagnosed with Stage IIIC melanoma. (Doc. 1, ¶ 38). Plaintiff alleges that this diagnosis has a 69% survival rate at five years. *Id*.

On June 2, 2020, Plaintiff filed a Complaint, against the following Defendants:

(1)    Monroe County (Where Plaintiff was incarcerated);

(2)    PrimeCare Medical, Inc. (the company that staffed the Monroe County Jail's medical department);

(3)    Kenneth Wloczewski, D. O. (a physician employed by PrimeCare, Inc. who examined Plaintiff at the Jail);

(4)    Paulina Foley, PA-C (a physician's assistant employed by PrimeCare Inc. who examined Plaintiff at the Jail); and

(5)    Grace Ramos, LPN (an LPN employed by PrimeCare Inc., who examined Plaintiff at the Jail).

(Doc. 1).[1]

Plaintiff alleges the following legal claims

Count I:    Eighth and Fourteenth Amendment denial of medical care against Defendants Wloczewski, Foley and Ramos.

Count II:   *Monell* / Supervisory Liability Claims against Defendants Monroe County and PrimeCare.

Count III:  Negligence / Medical Malpractice claim against Defendants Wloczewski, Foley, Ramos, and PrimeCare.

As relief, Plaintiff requests compensatory damages, punitive damages (against only the PrimeCare Defendants), reasonable attorneys' fees and costs, and such other equitable relief as the Court deems appropriate and just. (Doc. 1, ¶ 53).

On June 22, 2020, the PrimeCare Defendants filed a Motion to Dismiss. (Doc. 11). Along with their Motion, the PrimeCare Defendants filed a Brief in Support. (Doc. 12). On August 17, 2020, Plaintiff filed a Brief in Opposition. (Doc. 32). On August 27, 2020, the PrimeCare Defendants filed a Reply. (Doc. 34).

---

[1] Plaintiff also names 10 John Doe Defendants.

III.   LEGAL STANDARD

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss, the court "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). In reviewing a motion to dismiss, a court must "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

Following the rule announced in *Ashcroft v. Iqbal*, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, a complaint must recite factual allegations enough to raise the plaintiff's claimed right to relief beyond the level of mere speculation. *Id.* To determine the sufficiency of a complaint under the pleading regime established by the Supreme Court, the court must engage in a three-step analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because

they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 675, 679). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief" and instead must 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

IV.   ANALYSIS

A.   WHETHER PLAINTIFF ADEQUATELY PLEADED HIS EIGHTH/FOURTEENTH AMENDMENT DENIAL OF MEDICAL CARE CLAIM (COUNT I)

In Count I of the Complaint, Plaintiff alleges:

Defendants Wloczewski, Foley, and Ramos were deliberately indifferent to Mr. Ravert's serious medical needs and thereby violated Mr. Ravert's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and/or his right to due process of law under the Fourteenth Amendment to the United States Constitution.

(Doc. 1 ¶ 44).

Upon review of Plaintiff's Complaint, there appear to be three events that give rise to his claims against the individual medical Defendants. The first is on the night of December 29, 2016, when the skin tag/lesion on Plaintiff's leg, scheduled to be surgically removed, fell off on its own and was not preserved for biopsy or testing. The second is on January 3, 2017, when Defendant Wloczewski examined Plaintiff after the lesion fell off and (I infer) did not order any testing or monitoring of the

area of the skin tag/lesion. The third is the period between the June 15, 2018 cancer diagnosis and January 25, 2019, when the cancerous mass was excised.

At the outset, I note that it is not clear whether Plaintiff was convicted, or a pretrial detainee, at the time of the alleged denial of adequate medical care. Plaintiff has pleaded his claims under both the Eighth and Fourteenth Amendments.

The Eighth Amendment protects prisoners from the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. To prevail on any Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively, "sufficiently serious;" and (2) "a sufficiently culpable state of mind" of the defendant official. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[T]he Fourteenth Amendment affords pretrial detainees protections at least as great as the Eighth Amendment protections available to a convicted prisoner." *Natale v. Camden Cty. Correctional* Facility, 318 F.3d 575, 581 (3d Cir. 2003) (internal quotation omitted). Whether pleaded under the Eighth or Fourteenth Amendment, the same standard may be applied. *Id.*

To prevail on any Eighth or Fourteenth Amendment claim for the denial of adequate medical care, an inmate must allege: (1) deliberate indifference on the part of the prison officials; and  (2) a serious medical need. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). For

the purposes of resolving this Motion to Dismiss, the parties do not appear to dispute

that Plaintiff's diagnosis of invasive malignant melanoma is a serious medical need.

The PrimeCare Defendants argue:

> In the present matter, Plaintiff was evaluated on multiple occasions for his condition. Ultimately, he was diagnosed with cancer. However, a delay in diagnosis does not equate to a constitutional violation where his complaints were addressed and he received treatment. Plaintiff is seeking this Court to second guess the treatment decisions of the Medical Defendants after the outcome was determined. It is not the function of this Court to second guess treatment decisions of the medical providers. *See Pearson and Bednar, supra.* Thus, it is respectfully submitted that Plaintiff's federal cause of action as to the PrimeCare Defendants is nothing more than a medical negligence case and should be dismissed with prejudice.

(Doc. 12, p. 12).

In response, Plaintiff argues that, as a matter of law, providing some medical

care does not preclude a finding of deliberate indifference.

The Supreme Court has explained that the term "deliberate indifference" lies

"somewhere between the poles of negligence at one end and purpose or knowledge

at the other." *Farmer,* 511 U.S. at 837. It explained that:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; that is, the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.*

The line of demarcation where negligence ends, and deliberate indifference begins, is sometimes a subtle one. Not all failures to provide care demonstrate the state of mind required for deliberate indifference. For example, there is no constitutional violation when prison medical staff, through the exercise of professional judgment, negligently misdiagnoses or treats a condition. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Similarly, mere disagreement between prison medical staff and an inmate about the propriety, adequacy, or necessity of a particular course of treatment over another often does not rise to the level of a constitutional violation. *Monmouth*, 834 F.2d at 346 (citing *Bowering v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) and *Massey v. Hutto*, 545 F.2d 45, 26 (8th Cir. 1976)). The distinction between negligence and deliberate indifference is that, for deliberate indifference, a defendant acts with reckless disregard to a known harm. *Crawford v. Corizon Health, Inc.*, No. 1:17-CV-00113-BR, 2018 WL 9965506 at *3 (W.D. Pa. Jan. 2, 2018).

As noted in *Shultz v. Allegheny Cty.*:

> Our Court of Appeals has identified several other scenarios that satisfy *Estelle*, such as "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury," *Monmouth*, 834 F.2d at 346 (internal quotation omitted), or "where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,'" *Thomas v. Dragovich*, 142 F. App'x 33, 36-37 (3d Cir. 2005) (quoting *Monmouth*, 834 F.2d at 346). Similarly, if "deliberate indifference caused an easier and less efficacious treatment" to be provided, a defendant will have violated the plaintiff's Eighth

Amendment rights by failing to provide adequate medical care. *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (citing and quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)); *see also Estelle*, 429 U.S. at 104.

835 F.Supp.2d 14, 22 (W.D. Pa. 2011).

Bearing these principles in mind, I will assess whether the facts alleged by Plaintiff in his Complaint are enough to sustain an Eighth or Fourteenth Amendment claim for the failure to provide adequate medical care against Defendants Wloczewski, Foley, and Ramos.

       1.    Whether Plaintiff Pleaded a Plausible Claim Against Defendant Wloczewski

In support of his position that he pleaded a plausible Eighth Amendment claim against Defendant Wloczewski, Plaintiff argues:

**Dr. Wloczewski**. At MCCF, Dr. Wloczewski was the physician ultimately responsible for Mr. Ravert's care. Compl. ¶¶ 8, 22. When Mr. Ravert presented to Dr. Wloczewski for evaluation of his skin lesion on December 27, 2016, Dr. Wloczewski examined him and noted that Mr. Ravert had the lesion for over a year, started him on antibiotics, and scheduled removal of the lesion for the following week. *Id.* ¶ 22. Dr. Wloczewski, however, completely failed to perform any pathologic analysis or testing to confirm the staff's assessment that the lesion was in fact just a benign "skin tag." *Id.* ¶ 20.

When Mr. Ravert followed up with Dr. Wloczewski, on January 3, 2017, Dr. Wloczewski noted only that what he described as the "skin tag" had fallen off and was gone. *Id.* ¶ 26. Rather than preserving it for testing, Dr. Wloczewski inexplicably and intentionally directed that the lesion specimen simply be discarded after it was removed. *Id.* ¶ 25-26. Moreover, at no point did Dr. Wloczewski recognize Mr. Ravert's risk for melanoma and refer him to the appropriate specialist for treatment. *Id.* ¶ 22, 26.

This care was "grossly inadequate," *Terrance*, 286 F.3d at 843, and characterized by an approach that was "easier and less efficacious" than what was manifestly necessary under the circumstances. *Monmouth County*, 834 F.2d at 347. In addition to the failure to order diagnostic testing clearly called for under the circumstances, *see McElligott*, 182 F.3d at 1257-58 (concluding that failure to order diagnostic testing supported finding of deliberate indifference); *Shultz*, 835 F. Supp. 2d at 22-24 (same); *D'Agostino*, 2012 WL 425071, at *3 (same), Dr. Wloczewski's disposal of the specimen from Mr. Ravert's leg prevented any chance at a timely diagnosis of his cancer.

(Doc. 32, pp. 17-18).

As an initial matter, in the Complaint, Plaintiff alleges that Defendant Ramos conferred with the "on-call provider" for instruction. (Doc. 1, ¶ 25). Nothing in the Complaint identifies Defendant Wloczewski as the "on-call provider." Thus, contrary to Plaintiff's argument, there is no allegation in the Complaint that Defendant Wloczewski "directed that the lesion specimen simply be discarded." (Doc. 32, p. 17).

According to the Complaint, the conduct that Plaintiff alleges amounts to a violation of his Eighth Amendment rights for the denial of adequate medical care, on the part of Defendant Wloczewski, is failing to do any sort of biopsy or testing during the January 3, 2017 examination after the lesion fell off and failing to monitor Plaintiff's condition after the lesion fell off. Plaintiff alleges that he was not diagnosed with malignant melanoma until it reached stage IV. I reasonably infer from these allegations that Plaintiff's position is that, had a biopsy been taken earlier, the cancer might have been diagnosed at an earlier stage, which in turn would have

required less extensive and invasive treatment.  Plaintiff did not allege whether he requested a biopsy at that time. Plaintiff did not allege why Dr. Wloczewski did not perform a biopsy after the skin lesion fell off.

Considering the seriousness of Plaintiff's diagnosis (which he alleges carries a 69% survival rate at five years), and when all facts and reasonable inferences are construed in Plaintiff's favor, there is enough in the Complaint to nudge Plaintiff's claim across the threshold of plausibility, but only barely. In other words, at this early stage of litigation,  there is a "reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim." *Shultz*, 835 F.Supp.2d at 22 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n. 8 (2007)).

Accordingly, Defendants' request to dismiss Plaintiff's denial of adequate medical care claim against Defendant Wloczewski is denied.

> 2.   Whether Plaintiff Pleaded a Plausible Claim Against Defendant Foley

In support of his position that he pleaded a plausible Eighth Amendment claim against Defendant Foley, Plaintiff argues:

> **PA-C Foley**. Nearly one year later after his visit with Dr. Wloczewski, Mr. Ravert presented to MCCF's medical department after a basketball hit his right leg lesion and caused it to bleed. *Id.* ¶ 27. Medical staff again noted Mr. Ravert's polypoid lesion, provided wound care, and discharged Mr. Ravert without further examination, restriction, or referral to the on-call provider or another specialist. *Id.*

> On June 7, 2018, Mr. Ravert presented to PA-C Foley to address reddening and irritation of the skin on his right leg. *Id.* ¶ 28. PA-C Foley

noted that Mr. Ravert developed the rash over the last week, that it was in the shape of a bullseye, and that a quarter-sized fleshly nodule was in the center of that bullseye. *Id.* PA-C Foley then performed a punch biopsy to remove a portion of the nodule for laboratory analysis. *Id.* And, on June 15, 2018, PA-C Foley informed Mr. Ravert of his diagnosis of invasive malignant melanoma. *Id.* ¶ 29.

By the time PA-Foley finally acted to send Mr. Ravert out for the diagnostic evaluation and treatment that he had needed for the past eighteen months, it was too late. *See Shultz*, 835 F. Supp. 2d at 23 (rejecting argument that defendants' transfer of decedent to hospital precluded finding of deliberate indifference as decedent "was taken to a medical facility and testing for diagnosis of her condition was conducted only after she had deteriorated to the point of having to be admitted to the Intensive Care Unit" and "[a]t that juncture her condition already had progressed to the point where it was fatal"). Indeed, in the interim, Mr. Ravert's melanoma progressed to pathologic Stage IIIC, which carries a melanoma-specific prognosis of 5-year 69% survival, 10-year 60% survival. Compl. ¶ 3.

(Doc. 32, pp. 18-19).

As an initial matter, in the Complaint Plaintiff alleges that:

28.   On June 7, 2018, Mr. Ravert presented to Defendant Physician Assistant Foley to address reddening and irritation of the skin on his right leg. Physician Assistant Foley noted that Mr. Ravert developed the rash over the last week, that it was in the shape of a bullseye, and that a quarter-sized fleshly nodule was in the center of that bullseye. Physician Assistant Foley then performed a punch biopsy to remove a portion of the nodule for laboratory analysis.

29.   On June 15, 2018 Physician Assistant Foley informed Mr. Ravert of his diagnosis of invasive malignant melanoma.

(Doc. 1, ¶¶ 28, 29). Thus, unlike the argument in the brief, the Complaint suggests

that Defendant Foley examined *and* performed a punch biopsy on June 7, 2018.

Nothing in the Complaint suggests that Defendant Foley examined Plaintiff's skin lesion at any time before June 7, 2018.

Three days after his diagnosis, Plaintiff was seen by a dermatologist. Plaintiff was seen by an oncologist within three months of his first examination with Defendant Foley. Plaintiff was examined by a second dermatologist, and two other surgical oncologists before the melanoma was removed in January 2019. Plaintiff does allege that one dermatologist—Dr. Quy Pham, M.D.—"noted that the melanoma had grown and occasionally bled," during the six-month period between Defendant Foley's initial diagnosis and the surgery. (Doc. 1, ¶ 32).

Plaintiff argues that his claim against Defendant Foley should not be dismissed because the delay between Defendant Foley's diagnoses and the surgery amounts to deliberate indifference. Plaintiff is correct that courts have found deliberate indifference in cases where care was delayed for non-medical reasons. *See Shultz*, 835 F.Supp.2d at 21 ("if necessary medical treatment [i]s . . . delayed for non-medical reasons, a case of deliberate indifference has been made out."). In the Complaint, Plaintiff alleges that he was diagnosed with invasive skin cancer. He also alleges that he waited six months before that cancer was removed. I reasonably infer that it is Plaintiff's position that there was an immediate need for surgery and that he attributes the six month delay to a non-medical reason. He also alleges that his cancer grew during the six months he was waiting for surgery. Like his claim against

Defendant Wloczewski, this claim, as pleaded, just barely crosses the threshold of plausibility. However, because it has crossed that threshold it should be permitted to proceed.

　　　　　3.　　Whether Plaintiff Pleaded a Plausible Claim Against Defendant Ramos

In support of his position that he pleaded a plausible Eighth Amendment claim against Defendant Ramos, Plaintiff argues:

> ***Nurse Ramos***. Between his visits with Dr. Wloczewski on December 27 and January 3, Mr. Ravert saw Nurse Ramos at 9:43pm on December 29 after presenting to the medical department because the lesion had fallen off and caused his right leg to bleed. *Id.* ¶ 25. Nurse Ramos provided wound care and, also, conferred with the on-call provider for instruction on how to preserve the lesion specimen for lab analysis. *Id.* Nurse Ramos advised that there was no specimen preservative in the office and, thereafter, the provider directed her to simply discard the specimen, which Nurse Ramos did. *Id.* As explained above, this imprudent decision to throw away the specimen—without any testing or analysis whatsoever—caused a significant delay in detection of Mr. Ravert's cancer and a material worsening of his prognosis.

(Doc. 32, p. 19).

In reply, the PrimeCare Defendants argue:

> Plaintiff's chief criticism is that the skin specimen was not sent for pathology when it fell off Plaintiff's leg. It was Dr. Wloczewski's judgment that pathology was not necessary for a skin condition that is generally, if not always, non-cancerous, and this decision was consistent with a diagnosis of a skin tag. Moreover, this treatment decision was made by a physician. Thus, Nurse Ramos cannot be found to be deliberately indifferent when she is following the instructions of a physician. She would be acting outside the scope of her license to ignore a treatment decision of a physician.

(Doc. 34, p. 3).

The claim against Defendant Ramos is based on the act of disposing of the lesion after it fell off. A prison official acts with deliberate indifference to an inmate's serious medical need when she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Farmer,* 511 U.S. at 837. In the Complaint, Plaintiff alleges that, when the skin tag fell off, Defendant Ramos called the on-call provider "for instruction on how to preserve the lesion specimen for lab analysis." (Doc. 1, ¶ 25). Based on this allegation, it can be reasonably inferred that Defendant Foley knew that the specimen should be tested, and that failing to preserve the specimen could result in harm. Thus, reviewing the Complaint and all reasonable inferences that can be made, I find that Plaintiff has pleaded a plausible claim against Defendant Ramos.

Furthermore, I find that the PrimeCare Defendants' argument that Defendant Ramos should not be liable for following order from the unidentified "on-call provider" would be better addressed on summary judgment. The PrimeCare Defendants have not cited to any legal authority to support their position that a subordinate is not liable under § 1983 where the subordinate is following the direction of a supervisor. Furthermore, the issues concerning the scope of Defendant

Ramos' license, and the identity of the "on-call provider" would require consideration of documents outside the Complaint and its attachments.

    B.     PLAINTIFF'S *MONELL* CLAIM AGAINST PRIMECARE (COUNT II)

In Count Two of his Complaint, Plaintiff alleges:

> The violations of Mr. Ravert's constitutional rights under the Eighth and /or Fourteenth Amendments to the United States Constitution, Plaintiff's damages, and the conduct of the individual defendants were directly and proximately caused by the actions and/or inactions of Defendants Monroe County and PrimeCare, which have, with deliberate indifference, failed to establish policies, and procedures and/or have failed to properly train, supervise and discipline their employees regarding the provision of adequate medical care to prisoners with serious medical needs.

(Doc. 1, ¶ 46).

A private corporation contracted by a prison to provide healthcare for inmates cannot be held liable under 42 U.S.C. § 1983 on a *respondeat superior* theory. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003). Rather, pursuant to *Monell* and *Natale,* a private corporation like PrimeCare, contracted by a prison to provide healthcare can be held liable for constitutional violations only if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978) (subjecting municipalities to liability for policies or customs that cause constitutional deprivations); *Natale*, 318 F.3d at 584 (applying *Monell* to a private company providing medical services to inmates). To prevail on a § 1983 claim against

Defendant PrimeCare, Plaintiff must allege facts in the Amended Complaint that show "there was a relevant [PrimeCare] policy or custom, and that the policy caused the constitutional violation" for which he seeks relief. *See Natale*, 318 F.3d at 583-84.

In support of his *Monell* claim against Defendant PrimeCare, Plaintiff alleges that: (1) Defendant PrimeCare holds a contract to provide all medical services to inmates at MCCF, (Doc. 1, ¶ 7); and (2) Defendant PrimeCare employs Defendants Wloczewski, Foley, and Ramos (Doc. 1, ¶¶ 8-10, 14).

In their Brief, the PrimeCare Defendants argue that Plaintiff's *Monell* claim against Defendant PrimeCare should be dismissed because "Plaintiff cannot demonstrate an underlying constitutional violation." (Doc. 12, p. 13). As explained in Sections IV. A. 1, 2, and 3, of this opinion, Plaintiff has pleaded a plausible constitutional violation as to Defendants Wloczewski, Foley, and Ramos. The allegations in the Complaint are vague, but legally sufficient at this stage. These allegations, however, may not be sufficient at summary judgment without evidence of a specific policy, custom or failure to train or supervise. Accordingly, I am not persuaded that the *Monell* claim against Defendant PrimeCare should be dismissed at this stage.

V.    CONCLUSION

Accordingly, based on the foregoing:

1.    Defendants' Motion to Dismiss (Doc. 11) is DENIED.

2.    An appropriate Order will issue.


Date: March 17, 2021                    BY THE COURT

                                        *s/William I. Arbuckle*
                                        William I. Arbuckle
                                        U.S. Magistrate Judge