UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN RAVERT, | ) | CIVIL ACTION NO. 4:20-CV-889 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| MONROE COUNTY, *et al.,* | ) | |
| Defendants | ) | |

MEMORANDUM OPINION
*Defendants' Motion for Summary Judgment (Doc. 43)*

## I.    INTRODUCTION

In 2016 Shawn Ravert ("Plaintiff") was an inmate in the Monroe County Correctional Facility ("MCCF"). He alleges that the medical staff at this facility failed to make a timely diagnosis of what turned out to be a malignant melanoma. Plaintiff sued the County, the private corporation contracted by the County to provide medical care at the County facility, three members of the medical staff (employed by the private corporation), and ten John Doe's alleging Eighth & Fourteenth Amendment deliberate indifference, a *Monell* claim, and assorted medical negligence claims. All Defendants seek summary judgment on all claims in a single motion (Doc. 43). The matter is before me on Consent. The Motion for Summary Judgment is briefed and ready for decision. The sequence of events that ultimately lead to Mr. Ravert's cancer surgery are generally agreed upon. How to interpret those events is however, disputed.

## II.    FACTUAL BACKGROUND

### A.    GENERALLY

Ravert alleges that in providing him medical care at the Monroe County Correctional Facility, medical staff failed to recognize the onset of a malignant melanoma on his right shin in December 2016. He claims deliberate indifference to serious medical needs and medical negligence.

To show deliberate indifference he asserts, among other things, the medical defendants failed to have proper stitching equipment to remove the lesion when he first saw a doctor in December 2016, and then intentionally discarded the suspicious lesion a few days later (a lesion he removed himself) rather than preserve or send it for pathologic analysis. The Defendants concede the nurse didn't save or send the tissue because they did not have the proper supplies to preserve the sample for the lab.   Ravert alleges the deliberate indifference continued when they failed to re-check or monitor what they recklessly determined without any testing was a benign skin tag; and when they failed to refer Mr. Ravert to the appropriate specialist.

As a result of their deliberate indifference to this serious medical need, Mr. Ravert alleges his cancer was not diagnosed until eighteen months later in June 2018. In December 2016, Mr. Ravert had, he alleges, a totally curable pre-cancerous or Stage I disease at worst. However, the 18-month delay in diagnosis

allowed it to progress to pathologic Stage IIIC, which, according to plaintiff, carries a melanoma-specific prognosis of 5-year 69% survival, 10-year 60% survival.

The Court is now called upon by way of summary judgment to decide if there is sufficient evidence to allow any or all claims to go to trial. The defense asserts all Constitutional claims against all defendants should be dismissed. Ravert insists that all claims should go to trial. To decide these motions the Court will review the allegations in the complaint, the statements of undisputed material facts from each side and the legal arguments set forth in the competing briefs.

### B.    THE COMPLAINT

A general understanding of this case is detailed in the Complaint (Doc. 1) which is summarized here. Beginning in October 2016, Plaintiff was incarcerated at MCCF. (Doc. 1, ¶19).  On December 14, 2016, a lesion or "skin tag" on Plaintiff's right shin started bleeding while Plaintiff was playing basketball. (Doc. 1 ¶ 20). Plaintiff sought medical care at MCCF's medical department. *Id.* Medical staff provided wound care and discharged Plaintiff without further examination. *Id.*

On December 26, 2016, Plaintiff attempted to remove the lesion by himself, using a piece of string. (Doc. 1 ¶ 21). Following this attempt, Plaintiff again sought medical care at MCCF's medical department. *Id.*

On December 27, 2016, Defendant Kenneth Wloczewski examined the lesion on Plaintiff's leg. (Doc. 1, ¶ 22). During that examination, Defendant Wloczewski noted that the lesion had been present for one year and that removal was scheduled for the following week. *Id.*

On December 28, 2016, Plaintiff was examined at the MCCF Medical Department for follow-up. (Doc. 1 ¶ 23). During the examination, the lesion was "still intact" but appeared to be detaching from Plaintiff's leg due to Plaintiff's attempt to remove it. *Id.* An unidentified nurse provided wound care. *Id.*

On December 29, 2016, Plaintiff was examined by another unidentified nurse at the MCCF Medical Department. (Doc. 1, ¶ 24). During the examination, the lesion was "still intact" but appeared to be detaching from Plaintiff's leg due to Plaintiff's attempt to remove it. *Id.* A nurse provided wound care. *Id*.

Later the same evening, however, the lesion fell off. (Doc. 1 ¶ 25). When it did, Plaintiff was examined by Defendant Grace Ramos, a nurse at the MCCF Medical Department. *Id.* Defendant Ramos provided wound care to stop the bleeding. *Id.* She also conferred with an unidentified "on-call provider" by telephone to ask about preservation of the lesion that "fell off." *Id.* There was no preservative in the office. *Id.* Based on this information Defendant Ramos was instructed to discard the lesion. *Id*.

On January 3, 2017, Defendant Wloczewski examined Plaintiff. (Doc. 1, ¶ 26). Defendant Wloczewski noted that the "skin tag" had fallen off and was gone. (Doc. 1, ¶ 26).

Eleven months later, on December 12, 2017, Plaintiff's right leg began to bleed in the same area while playing basketball. (Doc. 1, ¶ 27). He was examined by unidentified staff members at the MCCF Medical Department. *Id.* During the examination, medical staff observed the presence of a polypoid lesion, provided wound care, and discharged Plaintiff without further examination, restriction, or referral to the on-call provider or another specialist. (Doc. 1, ¶ 27).

Six months later, on June 7, 2018, Plaintiff was examined by Defendant Paulina Foley (a physician's assistant at MCCF) with complaints of redness and irritation of the skin on his right leg. (Doc. 1, ¶ 28). Defendant Foley noted a rash in the shape of a bullseye with a quarter-sized fleshly nodule in the center, and performed a punch biopsy to remove a portion of the nodule for analysis. *Id.*

On June 15, 2018, eighteen months after the skin tag was brought to the attention of the MCCF staff and seventeen months after the skin tag fell off, Plaintiff was diagnosed with invasive malignant melanoma. (Doc. 1, ¶ 29).

On June 18, 2018, Dr. Akan Westheim confirmed the diagnosis of malignant melanoma. (Doc. 1, ¶ 30).

On September 6, 2018, Oncologist Mathew Miceli examined Plaintiff. (Doc. 1, ¶ 31). Dr. Miceli referred Plaintiff to surgical oncology for a wide resection of the melanoma, with a sentinel lymph node biopsy. *Id*.

On September 14, 2018, Dermatologist Quy Pham examined Plaintiff. (Doc. 1, ¶ 32). Dr. Pham noted that the melanoma had grown and occasionally bled. *Id*. Plaintiff was referred to skin oncology for treatment and staging. *Id.*

On September 27, 2018, Oncologist Colette R. Pameijer took a second biopsy of the lesion. (Doc. 1 ¶ 33). Dr. Pameijer recommended Plaintiff undergo a wide local excision and sentinel node biopsy. *Id.* Dr. Pameijer anticipated that Plaintiff would need to undergo a skin graft a few weeks after the excision and estimated that there was a 30% chance the cancer had spread to Plaintiff's sentinel lymph node. *Id*.

On October 15, 2018, Plaintiff had a third biopsy at Hershey Medical Center. (Doc. 1 ¶ 34). The biopsy showed T3b melanoma. *Id*. On November 21, 2018, a positron emission tomography ("PET") scan showed intense fluorodeoxyglucose ("FDG") activity (indicative of possible cancer) in Plaintiff's right leg lesion, moderately intense FDG activity in retropharyngeal lymph nodes, and low FDG avidity in his spleen. *Id*.

On December 5, 2018, Hematologist/Oncologist Vineela Kasireddy examined Plaintiff and referred him to surgical oncologist Jeffrey Farma for wide excision of the right leg melanoma. (Doc. 1, ¶ 35).

On January 25, 2019, six months after his first cancer diagnosis, Plaintiff had the following surgical procedures: a radical resection of a right pretibial melanoma; intraoperative lymphatic mapping; a sentinel lymph node biopsy of the right groin; and a skin graft. (Doc. 1, ¶ 36). Dr. Farma did the resection, mapping, and biopsy. *Id.* Dr. Neal Topham did the skin graft. *Id*. The surgical pathology report from this procedure described the excised mass as a 13 mm tumor with a pT4b Stage Classification. (Doc. 1, ¶ 37).

On February 25, 2019, Plaintiff was diagnosed with Stage IIIC melanoma. (Doc. 1, ¶ 38). Plaintiff alleges that this diagnosis has a 69% survival rate at five years and a 60% survival rate at ten years. *Id.*

## C.   THE STATEMENT OF MATERIAL FACTS

Defendants filed a joint Statement of Undisputed Material Facts (Doc. 44) with fifty-nine (59) separate factual allegations and eight supporting exhibits (Docs. 44-1 through 44-8). In summary the medical defendants contend that they each exercised professional judgment regarding the benign "skin tag" on Ravert's leg and were not indifferent much less deliberately indifferent to Ravert's medical needs. Their factual allegations do not mention negligence and the one reference to

a "standard of care" relates only to PA-C Foley. Their factual assertions will be detailed further in the discussion of each defendant.

Plaintiff filed a Responsive Statement of Facts (Doc. 49), responding to each of Defendant's factual allegations and attached eight different supporting exhibits of their own (Docs. 49-1 through 49-8). In summary, Ravert points out policy documents and testimony that he contends detail the legal responsibility of Monroe County and PrimeCare. He also disputes any reference to a "skin tag" referring to it instead as a "cancerous melanoma" that was misdiagnosed. Ravert's factual assertions will be detailed further in the discussion of each defendant.

With this understanding of the facts, we now turn to the procedural history and description of the legal claims in this case.

## III.    PROCEDURAL HISTORY

On June 2, 2020, Plaintiff filed a Complaint, against the following Defendants:

(1)    Monroe County (where Plaintiff was incarcerated);

(2)    PrimeCare Medical, Inc. (the company that staffed the Monroe County Jail's medical department);

(3)    Kenneth Wloczewski, D. O. (a physician employed by PrimeCare, Inc. who examined Plaintiff at the Jail);

(4)    Paulina Foley, PA-C (a physician's assistant employed by PrimeCare Inc. who examined Plaintiff at the Jail); and

(5)    Grace Ramos, LPN (an LPN employed by PrimeCare Inc., who examined Plaintiff at the Jail).

(Doc. 1).[1]

Plaintiff alleges the following legal claims:

Count I:      Eighth and Fourteenth Amendment denial of medical care against Defendants Wloczewski, Foley and Ramos.

Count II:     *Monell* / Supervisory Liability Claims against Defendants Monroe County and PrimeCare.

Count III:    Negligence / Medical Malpractice claim against Defendants Wloczewski, Foley, Ramos, and PrimeCare.

As relief, Plaintiff requests compensatory damages, punitive damages (against only the PrimeCare Defendants), reasonable attorneys' fees and costs, and such other equitable relief as the Court deems appropriate and just. (Doc. 1, ¶ 53).

On July 9, 2020, Defendant Monroe County filed a Motion to Dismiss. (Doc. 18). On June 22, 2020, the PrimeCare Defendants filed a Motion to Dismiss. (Doc. 11). On March 17, 2021, those motions were denied. (Docs. 38, 39, 40, 41).

On April 23, 2021, all named Defendants filed an Answer. (Doc. 42).

On September 3, 2021, all named Defendants filed a single Motion for Summary Judgment. (Doc. 43). Along with their Motion, Defendants filed a Statement of Facts (Doc. 44), supporting exhibits (Docs. 44-1 through 44-8), and a Brief in Support (Doc. 45).

---

[1] Plaintiff also names 10 John Doe Defendants.

On September 24, 2021, Plaintiff filed a Responsive Statement of Facts (Doc. 49), supporting exhibits (Docs. 49-1 through 49-8), and Brief in Opposition (Doc. 48).

On October 8, 2021, Defendants filed a Reply Brief. (Doc. 50).

Defendants' Motion for Summary Judgment has been fully briefed and is ready to decide.

## IV. LEGAL STANDARDS

### A. SUMMARY JUDGMENT

The defendants move for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dep't of Health & Human Servs.*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). With respect to an issue on which the

nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c).

Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine only if there is enough evidence to allow a reasonable factfinder to return a verdict for the non-moving party. *Id*. at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. "Under such circumstances, 'there can

be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. Consol. Rail Corp*., 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex*, 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *Hickey v. Merritt-Scully*, No. 4:18-CV-01793, 2022 WL 883851, at *2–3 (M.D. Pa. Mar. 24, 2022)

### B.   EIGHTH AMENDMENT DELIBERATE INDIFFERENCE

The Eighth Amendment protects prisoners from the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. To prevail on any Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively, "sufficiently serious;" and (2) "a sufficiently culpable state of mind" of the defendant official. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[T]he Fourteenth Amendment affords pretrial detainees protections at least as great as the Eighth Amendment protections available to a convicted prisoner." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (internal quotation omitted). Whether pleaded under the Eighth or Fourteenth Amendment, the same standard may be applied. *Id.*

The Supreme Court has opined that the term "deliberate indifference" lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer,* 511 U.S. at 837. It explained that:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; that is, the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.*

The line of demarcation where negligence ends, and deliberate indifference begins, is sometimes a subtle one. Not all failures to provide care demonstrate the state of mind required for deliberate indifference. For example, there is no constitutional violation when prison medical staff, through the exercise of professional judgment, negligently misdiagnoses or treats a condition. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Similarly, mere disagreement between prison medical staff and an inmate about the propriety, adequacy, or necessity of a particular course of treatment over another often does not rise to the level of a constitutional violation. *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (citing *Bowering v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977); *Massey v. Hutto*, 545 F.2d 45, 26 (8th Cir. 1976)). The distinction between negligence and deliberate indifference is that, for deliberate indifference, a defendant acts with reckless disregard to a known harm. *Crawford v. Corizon*

*Health, Inc.*, No. 1:17-CV-00113-BR, 2018 WL 9965506 at *3 (W.D. Pa. Jan. 2, 2018).

> As noted in *Shultz v. Allegheny Cty.*:
>
> Our Court of Appeals has identified several other scenarios that satisfy *Estelle*, such as "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury," *Monmouth*, 834 F.2d at 346 (internal quotation omitted), or "where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,'" *Thomas v. Dragovich*, 142 F. App'x 33, 36-37 (3d Cir. 2005) (quoting *Monmouth*, 834 F.2d at 346). Similarly, if "deliberate indifference caused an easier and less efficacious treatment" to be provided, a defendant will have violated the plaintiff's Eighth Amendment rights by failing to provide adequate medical care. *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (citing and quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)); *see also Estelle*, 429 U.S. at 104.

835 F. Supp .2d 14, 22 (W.D. Pa. 2011).

Prison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment. *Jones v. Muskegon County*, 625 F.3d 935, 944-45 (6th Cir. 2010).

Deliberate indifference can be shown even when defendants have provided extensive treatment to a prisoner. *See, e.g., Keller v. County of Bucks*, 209 F. App'x 201, 204-05 (3d Cir. 2006); *Kenney v. Montgomery County*, No. 13-cv-2590, 2013 WL 5356862, at *1, *5 (E.D. Pa. Sept. 25, 2013); *D'Agostino v. Montgomery County*, No. 11-cv-7728, 2012 WL 425071, at *1, *3 (E.D. Pa. Feb.

9, 2012); *Shultz v. Allegheny County*, 835 F. Supp. 2d 14, 18-19, 22-24 (W.D. Pa. 2011).

### C.   MEDICAL NEGLIGENCE

Professional negligence consists of a negligent, careless, or unskilled performance by a medical professional of the duties imposed on them by the professional relationship with their patient. It is also negligence when a medical professional shows a lack of proper care and skill in the performance of a professional act. 14.00 [FNa1] (Civ) Medical Professional Negligence-- Introduction, Pa. SSJI (Civ), §14.00 (2020).

Defendants correctly argue that "mere negligence" alone is not proof of deliberate indifference. However, Defendant's do not seek summary judgment on the medical negligence claims. They do urge that <u>if</u> all federal claims are dismissed the "Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, and the negligence cause [of] action should be dismissed without prejudice. (Doc. 45, p. 29).

### D.   PUNITIVE DAMAGES

Punitive damages may be awarded when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Tenon v. Dreibelbis*, 190 F.

Supp. 3d 412, 418 (M.D. Pa. 2016) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

Because "the standard to show 'deliberate indifference' is substantially the same as the standard to show 'reckless or callous indifference,'" courts have typically held that a claim for punitive damages should survive provided that a plaintiff sets forth a cognizable deliberate indifference claim. *See id*. (collecting cases). If there are sufficient facts from which a reasonable juror could find deliberate indifference on the part of any defendant, it follows that the plaintiff's claims for punitive damages against that defendant likewise survives summary judgment.

With these legal standards in mind, we now turn to the specifics of this case.

## V.   DISCUSSION

In their Brief in Support of summary judgement, Defendants raise the following four issues:

(A)   Whether summary judgment should be granted in favor of PrimeCare Defendants because the record is devoid of any evidence of deliberate indifference to a serious medical condition?

(B)   Whether PrimeCare medical, Inc. and Monroe County are entitled to summary judgment where the record is devoid of any evidence of an underlying constitutional violation or of a deficient policy, practice, or custom?

(C)   Whether Plaintiff's request for punitive damages should be denied?

(D)    Whether the Court should decline to exercise supplemental
jurisdiction over any remaining state law claims?

(Doc. 45, pp. 11-12).

### A.    WHETHER SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF PRIMECARE DEFENDANTS BECAUSE THE RECORD IS DEVOID OF ANY EVIDENCE OF DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL CONDITION

Using the standards discussed in Section III above, we now analyze the claims against each of the PrimeCare Defendants. The Plaintiff's Response to Defendant's Statement of Material Facts fails to admit or deny facts about the course of treatment.  Instead he simply repeats his argument that the "skin tag" was misdiagnosed and was really a carcinoma. For the purposes of determining the extent of care (but not the quality) I find that the Defendant's chronology of treatment is uncontested and accept those facts as true.

### 1.    Defendant Grace Ramos, LPN

Nurse Ramos argues that she consulted her superior and followed their advice:

> Plaintiff presented to Nurse Ramos after he had removed the skin lesion. This was the first time Nurse Ramos was confronted with such a scenario. It is the provider (physician, physician's assistant, nurse practitioner) who determines when a specimen is to be sent to pathology, and it is the provider's ultimate decision as to how to proceed in the scenario presented to Nurse Ramos.
>
> Nurse Ramos did the only thing she could do under the circumstances which was to contact a provider for guidance and potentially orders. Seeking guidance is certainly not deliberate indifference. This is especially the case where the presumptive diagnosis at the time Nurse

Ramos called the provider was that Mr. Ravert had a skin tag which are benign.

Plaintiff is seeking this Court to second guess the treatment decisions of Nurse Ramos after the outcome was determined. It is not the function of this Court to second guess treatment decisions of the medical providers with information learned after those treatment decisions were made by the medical professionals. *See Pearson and Bednar, supra*. Therefore, it is respectfully requested that summary judgment be entered in favor of Nurse Ramos concerning the federal cause of action.

(Doc. 45, pp. 17-18).

In response to the assertion that Nurse Ramos only followed the

advice of her superior Plaintiff argues:

it is clear that there are, at minimum, genuine issues of material fact as to whether the Individual Defendants were deliberately indifferent to Ravert's serious medical needs. As an initial matter, Nurse Ramos's failure to maintain an adequate inventory of formaldehyde led to a missed opportunity for early diagnosis of Ravert's cancer and demonstrates a substantial departure from the applicable standard of care and Defendants' own policies. *See* Exhibit 13 at ¶ 11. Given this, a reasonable jury could certainly determine that Nurse Ramos's failure to fulfill this basic nursing duty constitutes deliberate indifference.

Finally, the jury may reasonably find the Individual Defendants deliberately indifferent to Ravert's risk of cancer on account of their misrepresentations that his lesion had been sent out for biopsy. As detailed above, Nurse Ramos did not inform Ravert that she was going to discard his lesion instead of sending it out to be biopsied because she did not have the necessary formaldehyde. *See* Exhibit 4 at 39:17-20.

(Doc. 48, pp. 21-22).

On these facts I find that Nurse Ramos received the now removed skin lesion from Mr. Ravert, consulted with the "on call" medical professional, and acted on the advice given. That advice was to discard the sample because Dr. Wloczewski diagnosed it as a "benign skin tag" two days earlier. Although Plaintiff argues that the LPN should have had sample preservative material on hand, there is no evidence that ordering or providing supplies was her responsibility. Plaintiff relies on a reference to "Exhibit 13 at ¶11" but that Exhibit does not exist in this summary judgment record (Docs. 43, 44, 45, 48, 49, & 50). Plaintiff's Exhibit 8 (Doc. 48-8) (Monroe County Correctional Facility Policy & Procedure) at Section IV Procedure says that "Health Care Personnel shall . . . ¶11 have examination and/or counseling rooms available with sufficient medical equipment and supplies . . . ." Clearly this policy applies to the "Facility Health Authority" or the person in charge of the Authority, not an individual "Qualified Health Care Personnel" like Nurse Ramos.

Plaintiff's Expert, Dr. Hashmi (Doc. 49-4, pp. 7-8) does not include Nurse Ramos in his opinions regarding negligence. He is critical of the institutional failure to maintain supplies and policies, and the doctor's failure to properly screen the patient. These errors, however, do not fall on Nurse Ramos.   There is no evidence in this record that Nurse Ramos was

deliberately indifferent to Mr. Ravert's medical needs or even that she was

negligent.  Accordingly, summary judgment in favor of Nurse Ramos will be

granted on Counts I & III.

### 2.    Defendant Kenneth Wloczewski, D.O.

Dr. Wloczewski argues that he acted properly and did not violate Ravert's

Constitutional rights.

> Plaintiff was examined by Dr. Wloczewski on December 27, 2016, for
> the skin tag. Dr. Wloczewski did not do any sort of pathological
> analysis or testing to confirm his assessment, because skin tags are
> benign. This is based upon his history of removing hundreds of skin
> tags in both the emergency department and in the prison system. Dr.
> Wloczewski scheduled Plaintiff for removal of the skin tag the
> following week. He did not have a suture so he did not remove the
> skin tag on December 27, 2016.
>
> On January 3, 2017, Dr. Wloczewski evaluated Plaintiff. There was
> nothing left of the skin tag to biopsy. Dr. Wloczewski did not feel the
> need for any sort of a referral to another provider because the lesion
> on Plaintiff's skin looked like a skin tag.
>
> Plaintiff can be critical of Dr. Wloczewski's medical judgment,
> however, Dr. Wloczewski utilized his training, education, and
> experience in assessing Plaintiff as having a typical, benign skin tag
> which does not need pathology. Further, when he saw Plaintiff after
> the lesion was removed by Plaintiff, there was nothing left to biopsy.
>
> Thus, Plaintiff is seeking this Court to second guess the treatment
> decisions of Dr. Wloczewski after the outcome was determined. It is
> not the function of this Court to second guess treatment decisions of
> the medical providers with information learned after those treatment
> decisions were made by the medical professionals. See Pearson and
> Bednar, supra. Therefore, it is respectfully requested that summary

judgment be entered in favor of Dr. Wloczewski concerning the federal cause of action.

(Doc. 45, pp. 18-19).

In response Plaintiff argues:

The "on-call provider" who directed Nurse Ramos to dispose of Ravert's lesion—due to a lack of specimen preservative—likewise demonstrated a deliberate indifference to his serious medical needs. *See* Exhibit 12 at p. 4-7. Though the record does not definitively identify the "on-call provider," PA-C Mroz testified that it could have been any number of MCCF providers, including Dr. Wloczewski or PA-C Foley. *See* Exhibit 5 at 33:15-37-5. Moreover, the on-call provider—whether it was Dr. Wloczewski, PA-C Foley, or someone else— could have preserved the specimen without formaldehyde by simply putting it in cold sterile water or normal saline and placing into the refrigerator. *See* Exhibit 12 at p. 5. Because the on-call provider inexplicably directed it to be discarded instead, there is a reasonable basis for the jury to find that Dr. Wloczewski or PAC Foley violated Ravert's constitutional rights.

Finally, the jury may reasonably find the Individual Defendants deliberately indifferent to Ravert's risk of cancer on account of their misrepresentations that his lesion had been sent out for biopsy. As detailed above, Nurse Ramos did not inform Ravert that she was going to discard his lesion instead of sending it out to be biopsied because she did not have the necessary formaldehyde. *See* Exhibit 4 at 39:17-20. Likewise, at his January 3, 2017 visit, Dr. Wloczewski simply told Ravert to continue to wait for his biopsy results—which, of course, would never come. Id. at 44:12-18.

Ravert does not purport to simply "second guess" the medical judgment of the Nurse Ramos or Dr. Wloczewski, as Defendants suggest. *See* Br. at 11-13. Rather, Ravert predicates his federal constitutional claims on Defendants' 18-month delay in diagnosing his cancer because they failed to maintain the medical supplies necessary to preserve and send out his lesion for biopsy and then lied to him about the fact that they discarded the lesion in the first place.

(Doc. 45, pp. 19-20).

Plaintiff does not explain how the failure of the medical staff to tell him that his lesion was not in fact sent out for a biopsy would change the fact that the specimen was discarded on December 30, 2016 and was no longer available for laboratory analysis. Whether Dr. Wloczewski lied to his patient or was just wrong when he told him on January 3, 2017 to "wait for the biopsy results" does not change his original diagnosis of a benign skin tag. Whoever advised Nurse Ramos to discard the sample did so based on this diagnosis. Plaintiff's expert, Dr. Hasmi, is critical of this diagnosis and much of Dr. Wloczewski's care over the 18-month period from "skin tag" to "confirmed carcinoma." Unlike with Nurse Ramos, I find the record in this case tasks the Doctor along with the "Medical Authority" (i.e. PrimeCare) with the responsibility to obtain and stock supplies.[2] There is a genuine issue of negligence for the jury to decide regarding Dr. Wloczewski. Although a closer case, the Plaintiff has provided enough evidence for a jury to find his conduct amounted to "deliberate indifference." The cascading list of errors pointed out by Dr. Hashmi all point back to the initial diagnosis of a common benign skin tag. Reliance on the original diagnosis may well be negligent, and how he reached that diagnosis may also have been negligent.

---

[2] This analysis is spelled out further in the section on PrimeCare's liability.

Negligence alone is not deliberate indifference. But the analysis does not end there. Plaintiff argues that the Doctors knowledge of the inadequate procedures for ordering and keeping supplies renders his care "grossly inadequate." To support this contention Plaintiff argues:

> In short, the Individual Defendants' care was "grossly inadequate," *Terrance,* 286 F.3d at 843, and characterized by an approach that was "easier and less efficacious" than what was manifestly necessary under the circumstances. *Monmouth County*, 834 F.2d at 347. In addition to the failure to order diagnostic testing clearly called for under the circumstances, *see McElligott*, 182 F.3d at 1257-58 (concluding that failure to order diagnostic testing supported finding of deliberate indifference); *Shultz,* 835 F. Supp. 2d at 22-24 (same); *D'Agostino*, 2012 WL 425071, at *3 (same), Dr. Wloczewski's disposal of the specimen from Ravert's leg prevented any chance at a timely diagnosis of his cancer.

(Doc. 48, p. 23).

The record does not support the allegation that Dr. Wloczewski disposed of the specimen from Ravert's leg. Indeed, it is clear the Nurse Ramos physically did that. However, the doctor's failure to have necessary suture supplies to remove the lesion, his failure to notice (or at least chart) the fact that the lesion was tied off with a string, his failure to instruct the nursing staff to look for cancer, and the other shortcomings in Dr. Hashmi's report, taken together, could convince a jury that the doctor simply took the "easier and less efficacious" care route. Again, this is a close case. But a jury

could find that this level of care exhibits the kind of wanton reckless disregard necessary for a Constitutional violation.

Summary judgment in favor of Dr. Wloczewski will be denied on Counts I & III.

### 3.    Defendant Paulina Foley, PA-C.

Regarding the Constitutional claims against PA-C Foley she argues for summary judgment in her favor stating:

> On June 7, 2018, Plaintiff was examined for the first time by Paulina Foley, PA-C. After her assessment and obtaining a history, PA Foley questioned whether Plaintiff could have Lyme disease or basil cell carcinoma. At the visit on June 7, 2018, PA Foley performed a punch biopsy of the nodule to send to pathology. On June 15, 2018, PA Foley met with Plaintiff. PA Foley informed Plaintiff that the biopsy revealed that he had invasive malignant melanoma. Thereafter, PA Foley ordered Plaintiff to be referred to dermatology for follow-up care.
> Thus, the record as to PA Foley is that on the first day she examined Plaintiff, she performed a biopsy and had it sent to pathology. After the pathology results were received, she immediately referred Plaintiff to a specialist for follow up treatment. Additionally, Plaintiff has produced an expert report that PA Foley violated the standard of care.
>
> Notwithstanding the lack of any factual or expert support for a cause of action against Paulina Foley, Plaintiff has incredibly refused to voluntarily dismiss Paulina Foley from this case. However, there is literally no evidence that PA Foley violated the standard of care, much less was deliberately indifferent. Therefore, it is respectfully requested that summary judgment be entered in favor of PA Foley.

(Doc. 45, pp. 18-20).

In response to this argument that no deliberate indifference has been

shown Plaintiff responds:

> PA-C Foley argues separately for summary judgment on the basis that she was not involved in the treatment of Ravert's lesion until June 2018. *See* Br. at 13- 14. But the record reflects that PA-C Foley may very well have been the "on-call provider" that directed Nurse Ramos to dispose of Ravert's lesion in December 2016. PA-C Foley is certainly free to dispute this testimony at trial; however, her credibility is a question for the jury.

> In short, the Individual Defendants' care was "grossly inadequate," *Terrance*, 286 F.3d at 843, and characterized by an approach that was "easier and less efficacious" than what was manifestly necessary under the circumstances. *Monmouth County*, 834 F.2d at 347. In addition to the failure to order diagnostic testing clearly called for under the circumstances, *see McElligott*, 182 F.3d at 1257-58 (concluding that failure to order diagnostic testing supported finding of deliberate indifference); *Shultz*, 835 F. Supp. 2d at 22-24 (same); *D'Agostino*, 2012 WL 425071, at *3 (same), Dr. Wloczewski's disposal of the specimen from Ravert's leg prevented any chance at a timely diagnosis of his cancer.

> By the time PA-Foley finally acted to send Ravert out for the diagnostic evaluation and treatment that he had needed for the past eighteen months, it was too late. *See Shultz*, 835 F. Supp. 2d at 23 (rejecting argument that defendants' transfer of decedent to hospital precluded finding of deliberate indifference as decedent "was taken to a medical facility and testing for diagnosis of her condition was conducted only after she had deteriorated to the point of having to be admitted to the Intensive Care Unit" and "[a]t that juncture her condition already had progressed to the point where it was fatal").

(Doc. 48, pp. 22-24).

Plaintiff's response regarding PA-C Foley imputes too much of the evidence

of the conduct of others against Foley. While it might all be attributed to the

collective "them" from Mr. Ravert's point of view, Constitutional violations require individual action. Based on the evidence presented in the documents supporting the motion PA-C Foley did not act with deliberate indifference to Mr. Ravert's serious medical needs. She acknowledged and responded to them when she personally treated him.

Dr. Hasmi opines that the negligence of PA-C Foley is limited to the fact that she might have been the "on-call" person who suggested discarding the tissue on December 30, 2016. However, as indicated earlier, that decision was apparently made based on Dr. Wloczewski's "skin tag" diagnosis, whoever took Nurse Ramos' phone call and instructed her to simply discard the specimen. Summary judgment in favor of PA-C Foley will be granted on Counts I & III.

> **B.** **WHETHER PRIMECARE MEDICAL, INC. AND MONROE COUNTY ARE ENTITLED TO SUMMARY JUDGMENT WHERE THE RECORD IS DEVOID OF ANY EVIDENCE OF AN UNDERLYING CONSTITUTIONAL VIOLATION OR OF A DEFICIENT POLICY, PRACTICE, OR CUSTOM**

***Monell* Claims**: *Monell v. Department of Social Services*, 436 U.S. 658 (1978) held that municipalities and local governments can be sued under Section 1983 if the action was attributable to an official policy. They do not enjoy absolute immunity. But the defendant municipal officials must have had "final policymaking authority" to bind the municipality.

Regarding the *Monell* claims against them PrimeCare and the County argue:

First and foremost, as set forth in detail above, because there was no underlying constitutional violation, *Monell* liability cannot lie. *Stephens v. City of Englewood*, 689 Fed. Appx. 710, 714 (3d Cir. 2017) (affirming district court's dismissal of *Monell* claims against police department and city where plaintiffs failed to establish an underlying constitutional violation against the individual defendant-detectives).

Additionally, there is insufficient evidence to support a *Monell* theory as to PrimeCare. Simply stated, Plaintiff cannot demonstrate a violation of his constitutional rights. Plaintiff was evaluated on multiple occasions and received diagnostic testing. There are no facts which indicate defective policies and procedures. To the contrary, Plaintiff had access to care both inside the prison and to outside providers. Plaintiff's cause of action is premised upon alleged mistaken treatment decisions by individuals and not a systemic failure of the provision of medical care.

The case as to Monroe County is even more tenuous. Monroe County has a contract with PrimeCare to provide medical treatment to inmates incarcerated in the Monroe County Correctional Facility. It is abundantly clear that Plaintiff received medical attention every time he registered a complaint about his leg. The medical care provided included nursing evaluations, physician assessments, physician assistant assessments, and ultimately hospital care. The real gravamen of Plaintiff's case is that a quicker diagnosis should have been made by the PrimeCare Defendants. At most, Plaintiff is able to demonstrate negligence in failing to more timely diagnose his condition. However, a mere delay in treatment or even a misdiagnosis does not equate to deliberate indifference. Moreover, Monroe County nor its employees had any role in diagnosing Plaintiff's medical condition. Therefore, it is respectfully requested that this Honorable Court grant the Motion for Summary Judgment of PrimeCare and Monroe County.

(Doc. 45, pp. 22-23).

In response Plaintiff, regarding the *Monell* claims, argues:

Relevant here, MCCF maintains a Policy & Procedure pertaining to Medical and Health Services. **Exhibit 8** (MC00413-415). That Policy states that MCCF "shall provide medical, dental and mental health services to all inmates who in need of treatment and care . . . . The medical and health care services shall be provided by qualified Health Care Personnel and directed by the Facility Health Authority and in compliance with informed consent standards." *Id.* at MC00413.

The Policy further states that, particularly relevant to Ravert's care, "[a]ll medical instruments, equipment and supplies shall be inventoried on each shift with the inventories being maintained by medical and available for inspection by the Prison Administration." *Id.* at MC00415. Warden Haidle maintains responsibility for inspection of medical supply inventories pursuant to this Policy. **Exhibit 7** at 35:21-36:10.

PrimeCare maintains a Policy titled "Access to Care." **Exhibit 9** (PCM00595-606). The purpose of that Policy is "[t]o ensure patients access to care; that written policy and defined procedures, and actual practice evidences patients have access to care to meet their serious medical, dental, and mental health needs . . . . Notwithstanding, regulations, policies and procedures established by MCCF for its operation apply to all employees of PrimeCare Medical (PCM)." *Id.* at PCM00595. The Policy further states that, specifically relevant to Ravert's care, "[u]nreasonable barriers to patients must be avoided . . . . [and that] [e]xamples of unreasonable barriers include," among other things, "[h]aving understaffed, underfunded, or poorly organized system with the result that it is not able to deliver appropriate and timely care for patients' serious health needs." *Id.* With respect to specimen preservative inventories, PrimeCare CEO Thomas Weber testified that all of PrimeCare's laboratory supplies are provided free of charge from the laboratories with whom it works. *See* **Exhibit 10** (Weber Dep.) at 80:6-82:18. The process for obtaining additional preservative, Weber explained, "would have just been simply reaching out to the lab and saying, 'Hey, we need some more lab formaldehyde.'" *Id.* at 80:17-20. Weber stated that supplies, including formaldehyde, are included as part of the services that laboratories

provide to PrimeCare and that PrimeCare incurs no added cost for such supplies. *Id.* at 80:22-81:2.

Despite PrimeCare's Access to Care Policy, and its ability to easily obtain free formaldehyde, PrimeCare routinely fails to keep basic medical supplies, like specimen preservative, in the jails that where it manages medical services (including MCCF). Testimony from Dr. Wloczewski—the Medical Director at various PrimeCare jails (including MCCF), *see* **Exhibit 3** at 12:14-16, 24:21-24— confirms just as much. At his deposition, Dr. Wloczewski stated that some of the smaller prisons managed by PrimeCare (including MCCF) often fail to maintain the medical supplies needed to perform biopsies, including formaldehyde specimen containers. *See id.* at 37:13-38:2, 39:10-21. Dr. Wloczewski also testified that some of the smaller prisons managed by PrimeCare (including MCCF) often fail to have the sutures required to perform same. *See id.* at 41:19-42:3.

(Doc. 48, pp. 13-14)


### 1.    PrimeCare *Monell* Liability

A jury could reasonably find that PrimeCare failed to enforce its "Access to Care Policy" and had inadequate policies directly related to the harm Ravert suffered. According to Plaintiff's expert, Dr. Hashmi, several of the policy failures in this case are attributed to PrimeCare. For example:

1.  Mr. Ravert was provided substandard care at the Monroe County Correctional Facility by its vendor, PrimeCare, and various individual medical providers. Multiple deviations from accepted standards of correctional healthcare directly resulted in a delayed diagnosis of malignant melanoma which is associated with a poor outcome.  The deviations from standard of care are stated below.

. . . .

4. Dr. Wloczewski failed to maintain an adequate inventory of sutures, which delayed removal of the malignant lesion and sending it out for biopsy before it came off and was ultimately discarded. This led to a missed opportunity for early diagnosis of Mr. Ravert's cancer and shows Dr. Wloczewski's deliberate indifference to the obvious risk that Mr. Ravert had for malignant melanoma.

5. Dr. Wloczewski failed to give his staff anticipatory guidance about the risk of amputation associated with a strangulating trouniquet around the abnormal skin growth and therefor preparation for specimine collection and preservation were not made. Malignant tissue was discarded and a critical opportunity for early diagnosis was lost.

. . . .

9. The medical vendor, PrimeCare, did not provide a valid screening tool for skin lesions. The current nursing tool does not guide nurses to look for cancers and therefore is misleading the nurses.

10. PrimeCare regularly failed to maintain essential supplies at their facility, as Dr. Wloczewski admitted in his deposition (pages 37-42) and PA-C Foley acknowledged in her deposition (page 44). Suturing material and transport containers with preservative were not available causing a delay in diagnosis of Mr. Ravert's malignant melanoma. This custom runs contrary to PrimeCare Policy: Access to Care, Section III, which states "Unreasonable barriers to patients must be avoided . . . . Examples of unreasonable barriers include the following: . . . . Having understaffed, underfunded, or poorly organized system with the result that is not able to deliver appropriate and timely care for patients' serious health needs."

Hashmi Report: (Doc. 49-4, pp 37, ¶ 9, - p. 38 ¶10).

In addition to these formal opinions, Dr. Hashmi points to a lack of training by the nurses involved in the 2017 care. (Doc. 49-4, p. 7). Another of Plaintiff's experts, Nurse Denise M. Panosky, is highly critical of the quality of the nursing care Mr. Ravert received and she points out several policy failures attributable to

PrimeCare. (Panosky Expert Report, Doc. 49-6, pp. 8-10). These opinions, if accepted by the jury, create a direct conflict with the MCCF Access to Care Policies. (Doc. 49-7, pp. 2-13). Failure of PrimeCare to follow the policies imposed upon it by the County in their contract could be interpreted by the jury as a deliberate indifference to the medical care Mr. Ravert received.

Plaintiff has established a factual dispute regarding the policies and procedures of PrimeCare that prevent summary judgment.

### 2. County Liability for PrimeCare Policy

Plaintiff argues that Monroe County failed to police its medical services contract with PrimeCare and that the County had a duty to inspect the medical inventory. Both arguments fail. There is no evidence that the Warden or any county official knew that the medical care Ravert received was substandard (if it was). The duty to inspect noted in the various agreements relates to institutional security issues not medical policy or quality issues.

Monroe County has a constitutional obligation to "provide food, clothing, shelter and medical treatment for inmates." *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990). At the time of Ravert's medical care and incarceration, it is undisputed that Monroe County had chosen to fulfill its medical treatment obligation to the inmate population of MCCF by contracting with a third-party medical provider. Yet, the County's duty:

is not absolved by contracting with an entity such as [PrimeCare Medical, Inc.]. Although [PrimeCare] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of [PrimeCare]. In that sense, the county's duty is non-delegable.

*Ancata V. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985).

In this case, PrimeCare Medical, Inc. has potential liability with respect to Ravert's injuries. If believed by the jury, these policy failures will be imputed to the County. *See Ponzini v. Monroe Cnty.*, No. 3:11-CV-00413, 2015 WL 5123635 (M.D. Pa. Aug. 31, 2015)

### C.   WHETHER PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES SHOULD BE DENIED

The standards for an award of punitive damages are set forth in Section IV.D. above.

Regarding summary judgment on any punitive damages claim Defendants argue:

> In the present matter, the record is devoid of facts to support the imposition of punitive damages. Nurse Ramos was confronted with a situation which was unique to her experience. Thus, she contacted a provider for guidance and potentially orders. Such conduct is not reckless or outrageous.
>
> Dr. Wloczewski diagnosed Plaintiff with a skin tag which is a benign condition. Ultimately, it was determined that Plaintiff had melanoma and not a skin tag. However, all of Dr. Wloczewski's treatment decisions were premised upon his diagnosis of a skin tag. Those treatment decisions are not reckless or outrageous.

As to PA Foley, Plaintiff's experts do not opine that her care deviated from the standard of care. Nothing more needs stated as to the ridiculous request for the imposition of punitive damages as to PA Foley.

As to PrimeCare, it is abundantly clear that Plaintiff received medical attention every time he registered a complaint about his leg. The medical care provided included nursing evaluations, physician assessments, physician assistant assessments, and ultimately hospital care. The real gravamen of Plaintiff's case is that a quicker diagnosis should have been made by the PrimeCare Defendants. At most, Plaintiff is able to demonstrate negligence in failing to more timely diagnose his condition. However, a mere delay in treatment or even a misdiagnosis does not equate to reckless or outrageous conduct. Therefore, the PrimeCare Defendants respectfully request that Plaintiff's request for imposition of punitive damages be dismissed.

(Doc. 45, pp. 26-27).

Plaintiff responds to the request for summary judgment on punitive damages

by saying:

Judge Mariani recently held "[t]he Third Circuit appears to treat the terms 'deliberate indifference' and 'reckless indifference' interchangeably, and has declined several opportunities to elaborate on the distinctions, if any, between the two terms." *Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 543 (M.D. Pa. 2017) (citations omitted), *vacated on other grounds*, *Ponzini v. Monroe Cty.*, 789 F. App'x 313 (3d Cir. 2019) (reversing trial court's set aside of plaintiff's $8,000,000 punitive damages verdict against PrimeCare because there was reasonable basis for jury to make award). Given the similarities between the "deliberate indifference" and the "reckless indifference" standards, the Court should deny summary judgment as to Ravert's punitive damages claim on the same bases detailed above. *See, supra,* Sections IV.C-D.

(Doc. 48, pp. 26-27).

Plaintiff has the better argument here. Because "the standard to show 'deliberate indifference' is substantially the same as the standard to show 'reckless or callous indifference,'" courts have typically held that a claim for punitive damages should survive provided that a plaintiff sets forth a cognizable deliberate indifference claim. If there are sufficient facts from which a reasonable juror could find deliberate indifference on the part of any defendant, it follows that the plaintiff's claims for punitive damages against that defendant likewise survives summary judgment.

Plaintiff has survived summary judgment on deliberate indifference claims against Dr. Wloczewski, PrimeCare, and Monroe County for the reasons explained in this opinion. Therefore, the claim for punitive damages against them will also survive.

### D. WHETHER THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER ANY REMAINING STATE LAW CLAIMS

Turning to the state law negligence claims, Defendants argue:

It is submitted that this Honorable Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, and the negligence cause of action should be dismissed without prejudice.

(Doc. 45, p. 29).

In response Plaintiff argues that judicial economy supports retaining the supplemental state law negligence claims even if all other claims are dismissed. (Doc. 48, pp. 27-28).

Having concluded that at least three Constitutional deliberate indifference claims survive (against the Medical Director, Dr. Wloczewski, and PrimeCare) the supplemental state law negligence claims will also remain. These claims belong in this court at this stage of the litigation even without the Constitutional claims based on judicial economy, allowing a prompt and efficient disposition. 28 U.S.C. § 1367.

### E.   JOHN DOE DEFENDANTS: SUA SPONTE DISMISSAL

Although we have passed the close of discovery and reached the summary judgment stage in this action, Plaintiff has failed to amend his Complaint to identify the "John Doe" corrections officers and medical staff originally named in the Complaint as Defendants, or to effectuate proper service of original process upon them. Plaintiff commenced this action on June 2, 2020, by filing the Complaint in this matter. (Doc. 1.) In addition to five specifically named defendants, the complaint purported to sue ten "John Doe(s)" as party-defendants.

Now, more than a year after the close of fact discovery in this case, and more than eighteen months after the deadline for amendment of pleadings or joinder of parties expired (*see* Scheduling Order, Doc. 25), Plaintiff has still failed

to amend his complaint to identify any of the unnamed "John Doe" Defendants and join them to this action.

The use of John Doe Defendants is permissible "until reasonable discovery permits the true defendants to be identified." *Blakeslee v. Clinton Cty.*, 336 Fed. App'x 248, 250 (3d Cir. 2009) (emphasis added) (affirming dismissal of John Doe defendants where plaintiff failed to amend her complaint to identify true defendants after ten months of discovery). "[I]n the adversarial system of litigation the plaintiff is responsible for determining who is liable for her injury...." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 212 (3d Cir. 2006).

Thus, if a plaintiff fails to amend a complaint to identify unnamed John Doe defendants, a court may *sua sponte* dismiss those defendants prior to ruling on a summary judgment motion. *King v. Mansfield Univ. of Pa.*, No. 1:11-CV-1112, 2014 WL 4546524, at *10 (M.D. Pa. Sept. 12, 2014); *Guyton v. Bacher*, No. 3:12-27, 2014 WL 3942813, at *5 (W.D. Pa. Aug. 12, 2014); *see also* Fed. R. Civ. P. 21 ("on motion or on its own, the court may at any time, on just terms, add or drop a party."). *Whitehurst v. Lackawanna Cnty.*, No. 3:17-CV-00903, 2020 WL 6106616, at *4 (M.D. Pa. Mar. 5, 2020), *report and recommendation adopted,* No. CV 3:17-903, 2020 WL 6083409 (M.D. Pa. Oct. 15, 2020).  Here the proper course of action is to dismiss the John Doe claims.

**VI.     CONCLUSION**

1.   The ten John Doe Defendants named in the complaint are dismissed.

2.   Summary judgment in favor of Nurse Ramos will be granted on Counts I & III.

3.   Summary judgment in favor of Dr. Wloczewski will be denied on Counts I & III.

4.   Summary judgment in favor of PA-C Foley will be granted on Counts I & III.

5.   Summary judgment in favor of PrimeCare will be denied on Count II.

6.   Summary judgment in favor of Monroe County will be denied on Count II.

An appropriate order will follow.


Date: September 30, 2022                    BY THE COURT

                                           *s/William I. Arbuckle*
                                           William I. Arbuckle
                                           U.S. Magistrate Judge